IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ANDREA DISTRIBUTING, INC.,

                            Plaintiff,                          OPINION & ORDER

    v.                                                              15-cv-341-jdp

DEAN FOODS OF WISCONSIN, LLC,

                            Defendant.

For nearly a decade, plaintiff Andrea Distributing, Inc. transported dairy products to defendant Dean Foods of Wisconsin, LLC's customers in northern Wisconsin. During the same time, Andrea also had a distribution agreement with Dean Foods that permitted it to purchase dairy products from Dean Foods and resell them to Andrea's own customers. The parties' relationship deteriorated in 2014, when Andrea tried to insist on higher hauling rates. Dean Foods briefly accommodated Andrea, but it found alternative haulers at rates lower even than Andrea's original rates.

In March 2015, Dean Foods informed Andrea that it was terminating the hauling relationship. The termination dealt a financial blow to Andrea. In protest, Andrea stopped paying down its past-due balance for the products that it had purchased under the distribution agreement. But that just led Dean Foods to terminate the distribution relationship a few months later for nonpayment.

With the business relationship soured, Andrea sued Dean Foods in state court for violating the Wisconsin Fair Dealership Law (WFDL), Wis. Stat. § 135.01 *et seq.* Dean Foods removed the case to this court and counterclaimed to recover Andrea's past-due balance.

Dean Foods has now moved for summary judgment on Andrea's affirmative claim and on the counterclaim. Dkt. 31. The court will grant Dean Foods's motion. Based on the undisputed facts, the court reaches four conclusions. First, the parties' relationship involved two separate agreements: a distribution agreement and a hauling agreement. Second, although the parties' distribution agreement was covered by the WFDL, Dean Foods properly terminated it for nonpayment. Third, the parties' hauling agreement was not covered by the WFDL, and Dean Foods was within its rights to terminate it. Fourth, Andrea breached the distribution agreement and it owes Dean Foods for the products that it purchased. Dean Foods is entitled to judgment as a matter of law.

## UNDISPUTED FACTS

Andrea did not comply with this court's procedures for presenting factual information at summary judgment. First, Andrea did not respond to Dean Foods's proposed findings of fact. As the court's preliminary pretrial conference order explained, "[a] fact properly proposed by one side will be accepted by the court as undisputed unless the other side properly responds to the proposed fact and establishes that it is in dispute." Dkt. 15, at 9; *see also id.* at 13-15. Second, Andrea did not present its own proposed findings of fact, instead submitting an affidavit from Scott Andrea generally verifying "[t]hat the contents of [Andrea's] brief are true and accurate." Dkt. 40, ¶ 4.[1] The court's preliminary pretrial conference order provided clear instructions for submitting responsive proposed findings of

---

[1] Andrea's brief cites to "Pla. Prop. Facts," which appears to refer to the proposed facts submitted in support of Andrea's motion for preliminary injunction. Dkt. 14. But these proposed facts were not properly supported by admissible evidence; they relied primarily on unidentified statements by Bill and Scott Andrea.

fact, Dkt. 15, at 13-15, and Andrea's catchall affidavit did not comply with these instructions. The Seventh Circuit has "routinely held that a district court may strictly enforce compliance with its local rules regarding summary judgment motions." *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 630 (7th Cir. 2010). Dean Foods's reply brief aptly catalogued the shortcomings of Andrea's summary judgment evidence. Dkt. 41, at 2-4. The court will accept Dean Foods's proposed facts as undisputed, unless the record obviously contradicts them (and it does not). With this consideration in mind, the court finds that the following facts are material and undisputed.

Andrea is a Wisconsin corporation with its principal place of business in Spooner, Wisconsin. Andrea is in the business of hauling and distributing milk and other dairy products. It is a small company with four employees, a single warehouse and office building, and three refrigerated trucks for making deliveries. Dean Foods is a dairy distribution company, organized under Delaware law and, by virtue of the citizenship of its members, a citizen of Delaware and Texas.

Before it began working with Dean Foods, Andrea had a longstanding business relationship with another dairy distributor, Kemps (not a party to this suit). Although the business was successful, Andrea decided to explore other options. Andrea concluded that Dean Foods offered "spectacular" pricing for hauling and distributing. Dkt. 18 (Andrea Dep. 27:22-24). In 2007, Andrea decided to conclude its relationship with Kemps and switch to Dean Foods.

The relationship between Andrea and Dean Foods was two-fold: Andrea hauled products to Dean Foods's customers in northern Wisconsin, and Andrea purchased products from Dean Foods to resell to its own customers. Most of Dean Foods's customers in the area

were institutional customers, such as schools and large stores or retail chains. Most of Andrea's customers were smaller retail stores. The parties' relationship was governed by two separate agreements, both of which were part oral and part written.[2] Dean Foods assigned different managers to handle the hauling and distribution agreements.

For the hauling agreement, Dean Foods provided Andrea with a list of deliveries to make and then reimbursed Andrea for those deliveries. Dean Foods reimbursed Andrea regardless of whether the customer paid Dean Foods for the products. For the distribution agreement, Dean Foods provided Andrea with a price list for its products. Andrea ordered products by fax or phone, Dean Foods invoiced Andrea for the order and delivered the products to Andrea, and Andrea resold the products to its own customers. Neither the hauling agreement nor the distribution agreement required Andrea to purchase new trucks, lease new buildings, display Dean Foods's logo, or purchase clothing or uniforms for Andrea's employees. In fact, some of Andrea's employees continued to wear Kemps-branded apparel after the switch.

Andrea began to have financial difficulties in 2014. By September 2014, Andrea had built up a substantial past-due balance for products that it had purchased from Dean Foods under the distribution agreement. At Dean Foods's request, Andrea proposed three plans for paying down the past-due balance. All three plans provided for increased minimum "per stop" rates under the parties' hauling agreement: a $43 rate that would allow Andrea to "break even"; a $47 rate that would allow Andrea to make a modest profit; and a $52 rate that would allow Andrea to make a substantial profit. Dkt. 28-1. Dean Foods cautioned

---

[2] Andrea contends that the relationship was governed by one "master agreement." Dkt. 37, at 2. As explained below, however, Andrea's view of the relationship is contrary to the undisputed facts of the case and inconsistent with applicable law.

Andrea that its demand for a higher rate might lead Dean Foods to look for other haulers. When Andrea insisted on a higher rate, Dean Foods agreed to pay the $47 rate while it investigated whether other haulers could do the same job for less money.

In February 2015, Dean Foods discovered that other haulers could take over Andrea's hauling routes for between $20 and $30 per stop. Dean Foods contemplated dropping Andrea immediately, but ultimately decided against doing so because it might disrupt service to Dean Foods's customers, many of which were schools. In March 2015, Dean Foods offered a compromise solution: it would pay Andrea $40 per stop for the rest of the 2014-15 school year. Dean Foods again warned that if Andrea would not accept the hauling rates that were in effect for the earlier part of 2014, then Dean Foods would consider dropping Andrea altogether after the school year. Andrea again responded that it would be losing money at those rates.

Faced with Andrea's insistence on higher hauling rates, Dean Foods arranged to have a different company take over Andrea's hauling routes after the 2014-15 school year. On March 20, 2015, Dean Foods sent Andrea a letter indicating that it was terminating hauling services with Andrea, effective June 7, 2015.[3]

After receiving the March 20 letter, Andrea stopped making payments toward its past-due balance. As Andrea's corporate designee testified during his deposition, Andrea was withholding payments "in contest" because "Dean's violated the law and owed us it or some of it" for terminating the hauling agreement. Dkt. 18 (Andrea Dep. 89:1-22). Andrea also filed a complaint against Dean Foods in the Wisconsin Circuit Court for Washburn County

---

[3] The letter is dated March 20, 2013. Dkt. 28-2. The parties do not dispute that there was a typo in the year. Dean Foods wrote the letter in 2015.

on May 28, 2015, bringing a claim under the WFDL. Dean Foods removed the case to this court on June 4, 2015.

Because of Andrea's continued nonpayment, Dean Foods also decided to terminate the distribution agreement. On June 4, 2015, Dean Foods wrote a letter to Andrea indicating that Andrea had a past-due balance of $144,169.31. The letter informed Andrea that Dean Foods was terminating the parties' distribution relationship, effective 90 days after Andrea received the letter. But the letter also explained that Andrea could cure the deficiency and prevent termination of the distribution agreement by paying the entire past-due balance within 10 days. Since receiving the letter, Andrea has not made any payments on its past-due balance, although Dean Foods has been able to reduce the balance by applying various billing credits and product rebates.

On June 8, 2015, Dean Foods transferred Andrea's hauling routes to a new company, as indicated in its March 20 letter. Dean Foods continued to supply Andrea with products under the distribution agreement. But to avoid adding to the past-due balance, Dean Foods required Andrea to pay cash on delivery for any products that it purchased during that time.

Dean Foods answered Andrea's complaint and added a counterclaim for nonpayment of amounts due under the distribution agreement on June 19. Dkt. 3. In September 2015, after Andrea lost its hauling routes but a few days before the distribution agreement was set to expire, the court denied Andrea's motion for preliminary injunction. Dkt. 29. Consistent with the June 4 letter, the parties' distribution agreement ended on September 3, 2015, because Andrea had failed to pay off its past-due balance. The case proceeded to discovery, and Dean Foods has now moved for summary judgment. Dkt. 31.

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332, because the parties are diverse and the amount in controversy exceeds $75,000.

ANALYSIS

Dean Foods moves for summary judgment, which is appropriate if it "shows that there is no genuine dispute as to any material fact and [that Dean Foods] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To avoid summary judgment, Andrea "must set forth specific facts showing that there is a genuine issue for trial." *Id.* Andrea may not simply rely on the allegations in its pleadings to create such a dispute, but must "demonstrate that the record, taken as a whole, could permit a rational finder of fact to rule in [its] favor." *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). After reviewing the record evidence, the court concludes that Dean Foods is entitled to summary judgment on Andrea's WFDL claim and on Dean Foods's counterclaim.

## A.  Andrea's WFDL claim

The WFDL provides that "[n]o grantor, directly or through any officer, agent or employee, may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause." Wis. Stat. § 135.03. The law aims to promote the public's interest in fair business relations between dealers and grantors, protect dealers against unfair treatment by grantors, provide dealers with rights and remedies in addition to those existing under contract or common law, and generally govern all dealerships, including any renewals or amendments. *Id.* § 135.025. In this case, Andrea

7

contends that it had a dealership agreement with Dean Foods and that Dean Foods terminated that relationship without good case.

The premise for Andrea's WFDL claim is that the parties' entire relationship was part of one dealership agreement. Dean Foods disagrees, contending that there were two separate agreements that governed Andrea's hauling and distribution activities. In *Team Electronics of Janesville, Inc. v. Apple Computer, Inc.*, this court identified four factors that are useful for determining whether two agreements are distinct for purposes of the WFDL:

> (1) the language and history of the agreements;
>
> (2) the extent to which the grantor distinguished between the activities;
>
> (3) the extent to which the grantee distinguished between the activities; and
>
> (4) whether there are third parties performing the activities separately.

773 F. Supp. 153, 155 (W.D. Wis. 1991).[4] The factors recognize that "a dealership must be cohesive. Not every interaction between the parties is part of a single dealership." *Dynamic Movers, Inc. v. Paul Arpin Van Lines, Inc.*, 956 F. Supp. 836, 839 (E.D. Wis. 1997). Taking each factor in turn, the court concludes that the hauling and distribution agreements were separate aspects of the relationship between Andrea and Dean Foods.

First, the record does not contain a written contract defining the terms of each agreement. But the parties structured the hauling agreement differently than they structured the distribution agreement. For example, the two activities served different customers and had different compensation methods. Andrea earned money under the hauling agreement

---

[4] The parties agree that these are the relevant factors for determining whether Andrea's hauling and distribution agreements were distinct. *See* Dkt. 32, at 9 and Dkt. 37, at 12-13.

based on negotiated rates for each stop. Dean Foods gave Andrea a list of stops to make to Dean Foods's customers, and it paid Andrea regardless of whether the customer paid Dean Foods for the products. Dkt. 33, ¶¶ 24-26. Under the distribution agreement, Dean Foods provided Andrea with a price list for its products. Andrea earned money by ordering products and reselling them to its own customers at a mark-up. *Id.* ¶ 27. This factor weighs in favor of treating the agreements as separate for purposes of the WFDL.

Second, Dean Foods treated the agreements as distinct and assigned separate managers to work with Andrea on each aspect of the parties' relationship. Dkt. 34, ¶¶ 3-4. And each termination letter that Dean Foods sent to Andrea referred to only one line of business: the March 2015 letter indicated that Dean Foods was "terminating [its] *hauling* services with Andrea," Dkt. 28-2 (emphasis added), and the June 2015 letter indicated that Dean Foods was "terminat[ing] its *distribution* relationship with Andrea," Dkt. 28-3 (emphasis added). This factor weighs in favor of treating the agreements as separate for purposes of the WFDL.

Third, Andrea maintains that it treated the relationship with Dean Foods as one master agreement. Andrea's only support for its assertion is the deposition testimony of one of its employees, who indicated that he did not talk about the two aspects of Andrea's business as separate aspects because the physical work involved for both was generally the same. Dkt. 18 (Andrea Dep. 25:11-26:1). But the same employee also confirmed that Andrea indeed had two separate aspects of its business: hauling and distribution. *Id.* (Andrea Dep. 22:16-23:1). Even construing the employee's testimony as demonstrating that Andrea treated the two agreements as one—which is a very generous construction of the testimony—this court has noted that the second and third factors "are not particularly useful [when] both

parties are so small that institutional separateness is impracticable." *Eisencorp, Inc. v. Rocky Mountain Radar, Inc.*, No. 03-cv-157, 2004 WL 868518, at *5 (W.D. Wis. Apr. 15, 2004), *aff'd*, 398 F.3d 962 (7th Cir. 2005). Dean Foods is not so small that separation is impracticable, but Andrea is—it has only four employees, a fleet of three trucks, and a single warehouse and office building. Under the circumstances, Andrea's understanding of its relationship with Dean Foods is not particularly informative.

Fourth, other companies that work with Dean Foods can operate only as haulers if they want to do so. Dkt. 33, ¶ 22. In fact, Andrea had the option of agreeing to haul Dean Foods's products without also operating as a distributor. *Id.* This factor weighs in favor of treating the agreements as separate for purposes of the WFDL.

Three of the four factors suggest that there were two separate agreements, and the remaining factor tips in Andrea's favor only slightly, if at all. Andrea's discussion of these factors—which mostly consists of bald assertions without citations to record evidence—does not create any genuine dispute of material fact about the nature of the parties' relationship. *See* Dkt. 37, at 12-13. Based on the record evidence, the court concludes that the parties had two separate agreements: a hauling agreement and a distribution agreement.

When two parties have more than one distinct aspect of a business relationship, courts analyze each aspect individually for purposes of the WFDL. *See, e.g., Rakowski Distrib., Inc. v. Marigold Foods, Inc.*, 193 F.3d 504, 507 (7th Cir. 1999); *Eisencorp*, 2004 WL 868518, at *5. The parties do not dispute that the WFDL governed their distribution agreement, which means that Dean Foods needed to have good cause before terminating it.

Under the WFDL, "good cause" means

> (a) Failure by a dealer to comply substantially with essential and
>     reasonable requirements imposed upon the dealer by the

> grantor, or sought to be imposed by the grantor, which requirements are not discriminatory as compared with requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement; or
>
> (b) Bad faith by the dealer in carrying out the terms of the dealership.

Wis. Stat. § 135.02(4). Failure to pay past-due amounts certainly qualifies as good cause; indeed, Wis. Stat. § 135.04 contemplates that "nonpayment of sums due under the dealership" is a reason to terminate a dealership. In the context of nonpayment, the WFDL requires a grantor to "provide the dealer with at least 90 days' prior written notice. The notice must provide that the dealer has 10 days in which to remedy such default from the date of delivery or posting of such notice." *White Hen Pantry v. Buttke*, 100 Wis. 2d 169, 301 N.W.2d 216, 220 (1981). Here, Dean Foods complied with these requirements in its letter to Andrea on June 4, 2015. Dkt. 28-3. Andrea cannot dispute that Dean Foods had good cause to terminate the distribution agreement and complied with the WFDL in doing so.

This leaves the hauling agreement. The dispositive issue is whether the WFDL governed this aspect of the parties' relationship: if the WFDL did not apply, then Dean Foods did not need good cause to terminate the hauling agreement. Dean Foods contends that Andrea's contract to provide hauling services did not create a "dealership," which the WFDL defines as a contract

> by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Wis. Stat. § 135.02(3)(a).

11

Courts have consistently found that simple hauling agreements (and in some cases, *milk* hauling agreements specifically) do not create dealerships. *See, e.g., Van Groll v. Land O'Lakes, Inc.*, 310 F.3d 566, 568-71 (7th Cir. 2002); *Rakowski Distrib.*, 193 F.3d at 508; *Kania v. Airborne Freight Corp.*, 99 Wis. 2d 746, 300 N.W.2d 63, 72-73 (1981). These decisions focused on whether the hauler had been required to purchase equipment, build facilities, use the distributors' logos on its equipment or uniforms, or make other "substantial investment[s]" in the grantor's business. *Van Groll*, 310 F.3d at 569 (discussing *Rakowski Distrib.*, 193 F.3d at 508). There is no material difference between these cases and Andrea's case. Andrea never had to purchase new trucks or construct new buildings. Dkt. 33, ¶ 18. Dean Foods did not require Andrea to display Dean Foods's logo or purchase uniforms for Andrea's employees (in fact, some of Andrea's employees continued to wear Kemps-branded apparel while hauling Dean Foods's products). *Id.* ¶¶ 19-20. And Andrea has not adduced any evidence that Dean Foods directed or controlled Andrea's business beyond providing a list of stops to make and the products to deliver at each stop.

Andrea nevertheless tries to distinguish these and other similar cases by asserting—without citing to supporting evidence in the record—that it essentially operated as a "satellite office of Dean Foods," and that it "engaged in activities that are typical of dealers." Dkt. 37, at 7-9. Even overlooking the lack of factual support for these assertions, Andrea's arguments are not persuasive because they begin from the incorrect premise that the hauling and distribution activities were part of one relationship with Dean Foods. To the extent that Andrea engaged in dealership-like activities, those activities were pursuant to the *distribution* agreement, not the hauling agreement. Based on the record evidence, the court concludes that the hauling agreement did not create a "dealership" under Wis. Stat. § 135.02(3). The

WFDL's good cause protections therefore did not apply to the agreement, and Dean Foods was entitled to terminate it at will. *See Rakowski Distrib.*, 193 F.3d at 508 ("Termination at will often has harsh consequences for the ousted party, whether within the context of an employment relationship, an agency, or a more general contract for services, but that is simply a risk of doing business that both parties must address.").

Dean Foods did not violate the WFDL in terminating its hauling and distribution agreements with Andrea. Thus, Dean Foods is entitled to summary judgment.

## B. Dean Foods's breach of contract counterclaim

Dean Foods has alleged a counterclaim against Andrea for breach of contract, seeking to recover the past-due balance that Andrea accumulated pursuant to the distribution agreement. To succeed on a claim for breach of contract, Dean Foods must prove: "(1) the existence of a contract creating obligations flowing from defendant to plaintiff; (2) a breach of those obligations; and (3) damages from the breach." *Uebelacker v. Paula Allen Holdings, Inc.*, 464 F. Supp. 2d 791, 801 (W.D. Wis. 2006) (citing *Nw. Motor Car, Inc. v. Pope*, 51 Wis. 2d 292, 187 N.W.2d 200, 203 (1971)). Dean Foods has satisfied these elements by submitting proof that Andrea currently has an unpaid balance of $138,250.62. Dkt. 34, ¶ 14 and Dkt. 34-1.

Andrea has not adduced any evidence to genuinely dispute that it failed to pay for all of the products that it purchased from Dean Foods, nor has Andrea adduced evidence to genuinely dispute the amount of its past-due balance. To the contrary, Andrea's own employee acknowledged that Andrea withheld payments for products that it purchased "in contest" for what it perceived to be Dean Foods's unlawful actions. Dkt. 18 (Andrea Dep. 89:1-91:25). Now Andrea contends that it should not have to pay because Dean Foods

prematurely terminated "negotiations that were to govern compensation and repayment of past-due amounts." Dkt. 37, at 13. But Andrea does not explain how its version of events— even if true—would justify its refusal to pay Dean Foods for the products that it purchased. In short, there is no dispute that Andrea owes a past-due balance of $138,250.62. Dean Foods is entitled to summary judgment on its counterclaim.

## C. Motion for extension of time

The parties have submitted a joint motion for extension of time, seeking to reset the litigation calendar and move the trial date because they elected to not pursue discovery while Dean Foods's motion for summary judgment has been pending. Dkt. 42.[5] Very risky move: that motion would have been denied no matter the outcome of the summary judgment motion. This court sets firm trial dates and it does not afford parties the luxury of suspending discovery while dispositive motions are pending.

But the gamble has paid off in this case. Because Dean Foods is entitled to judgment as a matter of law, the motion for extension of time is denied as moot.

---

[5] The motion as filed by counsel for Dean Foods shows that attorney Thomas O. Mulligan signed on behalf of Andrea. *See* Dkt. 42, at 2. According to the court's electronic filing procedures, the "s/ full name" designation represents the signatory's original signature, which the electronic filer must hold for verification. *See Electronic Filing Procedures*, Western District of Wisconsin, http://www.wiwd.uscourts.gov/electronic-filing-procedures#E._Signatures (last visited, June 7, 2016).

On October 8, 2015, the Wisconsin Supreme Court suspended Attorney Mulligan's license to practice law in Wisconsin for nine months, effective November 7, 2015. *In re Disciplinary Proceedings Against Mulligan*, 2015 WI 96, ¶ 51, 365 Wis. 2d 43, 870 N.W.2d 233. Public records indicate that Attorney Mulligan's license is still suspended for disciplinary reasons. Although this motion does not affect the outcome of the case, the court will nevertheless refer this matter to the Office of Lawyer Regulation.

ORDER

IT IS ORDERED that:

1.  Defendant Dean Foods of Wisconsin, LLC's motion for summary judgment, Dkt. 31, is GRANTED.

2.  The parties' motion for extension of time, Dkt 42, is DENIED as moot.

3.  The clerk of court is directed to enter judgment in favor of defendant in the amount of $138,250.62 and close this case.

Entered June 7, 2016.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge

15